UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


PROTECT DEMOCRACY PROJECT, INC.;        )
BRENNAN CENTER FOR JUSTICE AT           )
NEW YORK UNIVERSITY SCHOOL OF LAW;      )
MICHAEL F. CROWLEY; and                 )
BENJAMIN WITTES,                        )
                                        )
                    Plaintiffs,         )   Civil Action
                                        )   No. 18-10874-DPW
 V.                                     )
                                        )
U.S. DEPARTMENT OF JUSTICE;             )
DEPARTMENT OF HOMELAND SECURITY;        )
JEFFERSON BEAUREGARD SESSIONS, III,     )
In His Official Capacity as Attorney    )
General of The United States; and       )
KIRSTJEN NIELSEN,                       )
In Her Official Capacity as Secretary   )
of the Department of Homeland Security, )
                                        )
                    Defendants.         )



BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

MOTION HEARING

December 4, 2019


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210




Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiffs:
      Shane A. Hunt
 3    O'Melveny & Myers LLP
      7 Times Square
 4    New York, NY 10036
      212-326-2000
 5    shunt@omm.com

 6    Benjamin L. Berwick
      Protect Democracy
 7    15 Main Street
      Watertown, MA 02472
 8    909-326-2911
      ben.berwick@protectdemocracy.org
 9
      Counsel on behalf of Defendant:
10    Susan M. Poswistilo
      United States Attorney's Office
11    John Joseph Moakley Federal Courthouse
      1 Courthouse Way
12    Suite 9200
      Boston, MA 02210
13    617-748-3103
      susan.poswistilo@usdoj.gov
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (The following proceedings were held in open court
3     before the Honorable Douglas P. Woodlock, United States
4     District Judge, United States District Court, District of
5     Massachusetts, at the John J. Moakley United States Courthouse,
6     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on
7     (Case called to order.)
8              DEPUTY CLERK:  Would counsel please identify
9     themselves for the record.
10             THE COURT:  Plaintiff first.
11             MR. HUNT:  My name is Shane Hunt on behalf of
12    plaintiffs, and I'm here with my co-counsel Ben Berwick.
13             MS. POSWISTILO:  Good afternoon, Your Honor.  Susan
14    Poswistilo for the United States.
15             THE COURT:  Okay.  So a housekeeping matter first.  We
16    had a request from a Noah Lanard, who is with Mother Jones
17    Magazine, that he be permitted to listen in on these
18    proceedings because it was difficult for him to get here.  And
19    Ms. Beatty I think had a conversation with him.  I believe
20    Mr. Lanard is on the phone.  Is that right, Mr. Lanard?
21             MR. LANARD:  Yes, that's right, Your Honor.
22             THE COURT:  And as I understand it, Ms. Beatty told
23    you what my instructions are, which is that we can provide this
24    opportunity but it has to be subject to our local rules, which
25    provide that there can be no recording or dissemination by
```

1    recording of anything that transpires here.  It's the rule that

2    we'd apply if you were here.  You're not.  But I understand

3    that you're prepared to comply with the rule and you represent

4    that you are complying with the rule.

5          MR. LANARD:  That's correct.  Thank you.

6          THE COURT:  Fine.  So we'll go forward then on that

7    premise.

8          I guess the issues that I really want to focus on are

9    why, assuming as I do, that this is a case of first impression

10   in the First Circuit.  There's no governing First Circuit law.

11   And you'll correct me if I'm wrong.  There is no case law that

12   permits this kind of action under the IQA or derivatively

13   through the APA at this point.  Has there been any change in

14   the law?  Does the plaintiff suggest that there's any case law

15   that says -- and listen carefully to me because your briefing

16   elided this issue, that there's nothing under the IQA and the

17   APA that permits an action like this.

18         MR. HUNT:  Your Honor, we would agree that no court

19   has allowed one of these cases to go forward, but we would

20   suggest that there is no controlling case law in the First

21   Circuit.

22         THE COURT:  Well, no.  I've said that.  There isn't.

23   I don't think there is any case law in the First Circuit on

24   this issue, but I do want to be sure that we're focused on this

25   because there's been a kind of elision of distinctions here,

1      particularly in the briefing.  Fortunately the briefing is not

2      covered by the IQA.  And so things like leaving out whether or

3      not an opinion that's cited is actually a dissent, which of

4      course is something that's customary in legal briefing, or not

5      making a distinction for informational standing purposes of

6      cases involving other kinds of statutes.  So I want to be

7      focused on this, and I'm being very precise.  It's simply not

8      that helpful to receive briefing that is effusive but doesn't

9      come to grips with the statutes that are involved.

10             So back to the original point, I take it that there is

11     no controlling case law in the First Circuit and, in point of

12     fact, there's nothing dealing with these two statutes working

13     in a way that you've attempted to frame them, that any court

14     has held provides standing or provides possibility of

15     proceeding forward.

16             MR. HUNT:  You're right, Your Honor, there's been no

17     specific court that has found that a case can proceed under the

18     APA.  However, we would --

19             THE COURT:  Or the IQA.

20             MR. HUNT:  Well, we don't suggest that the IQA

21     standing alone provides a private right of action.

22             THE COURT:  Okay.  But in any event, assuming that

23     we're going to go the -- use the APA route as a kind of vehicle

24     for vindicating whatever is in the IQA, there hasn't been a

25     case that's done it.  In fact, all the cases that have reported

1    on this have declined to do so.

2            MR. HUNT:  That's correct, but we would suggest

3    that --

4            THE COURT:  You'll get a chance to make your

5    suggestions.  I've got to a taste of what those suggestions

6    are, but bear in mind my view that I want to get very specific

7    about this because informational standing is from my

8    perspective something that's governed by the Congressional

9    direction and not a kind of generalized platonic ideal of

10   informational standing.  So that's what I wanted to know from

11   you for right now.

12           Ms. Poswistilo, I'm going to ask you a series of

13   questions.  I take it you don't disagree with your friend about

14   this, about the state of the law, but I'm going to ask you some

15   questions that may seem off the wall, but I mean to understand

16   how far you're going to take it or how far the government takes

17   it, okay?  So let's do this one.

18           Let's assume that NASA issues a report and they say

19   the world is flat; the Earth is flat, okay?  And there's a

20   request for correction by someone, someone who is affected by

21   this.  And there's an appeal, administrative appeal, and it's

22   denied.

23           Is there any further role for the judiciary in that,

24   any judicial review, any way for the courts to get themselves

25   involved in that?

1          MS. POSWISTILO:  Not under the IQA and/or the APA.

2          THE COURT:  And so I understand the narrow response,

3   but maybe I'll take it broader.  Is there any way for the

4   courts to get involved in that that you're aware of?

5          MS. POSWISTILO:  In other words, if the government

6   comes out and says something we would all likely agree to be

7   entirely preposterous at this --

8          THE COURT:  Well, assume that my role is I'm agnostic.

9   It's not -- I simply deal with whatever process the parties

10  have to vindicate their rights in the courts.  And I have to

11  ask the threshold question, how do they get to the courts.

12          And so I ask this, what you characterize I think

13  probably accurately, but again, I'm agnostic on the question of

14  whether the world is flat.  I ask this question about the world

15  being flat.  The government is saying that it's flat.  Somebody

16  like the plaintiffs in this case come in and say we're entitled

17  to accurate information of sufficient quality, even capable of

18  reproduction, which is the scientific analysis that most

19  recently is given by the OMB.  Is it the position of the

20  government that there's no role for the courts?

21          MS. POSWISTILO:  The position of the government is

22  depending on the plaintiff's interests.  In other words --

23          THE COURT:  Okay.  So the plaintiffs are astronomers.

24  I don't know whether Protect Democracy extends to that concern,

25  but they're astronomers.  They're interested in understanding

1   fully how the solar system works.  They know that NASA is

2   supposed to have some information about this, and in fact NASA

3   under my hypothetical have been required to provide a report

4   about whether or not the world is flat, and NASA reports that

5   it is.  And they're disappointed because they have a sneaking

6   suspicion that it's not, and so they seek to have a correction

7   made and to obtain information that's accurate, and that is

8   turned down, and then there's an appeal, and that's turned

9   down.  Is that the end of it?

10          MS. POSWISTILO:  Well, unless there is a specific

11   statute, FOIA for example, but in order to correct the report,

12   if that's the particular question --

13          THE COURT:  I guess so.

14          MS. POSWISTILO:  It's my understanding that would have

15   to be the end of it, unless there's a some particular

16   statute --

17          THE COURT:  So let's assume -- I probably should have

18   closed off that escape route and said there's no statute that

19   says otherwise, okay?  So as you say, it can't come to the

20   courts about that.  And why is that?  KHECK that what we both

21   would in our nongovernmental positions view as outrageous, I

22   suppose, is an example, but that's the way to test this sort of

23   thing.

24          MS. POSWISTILO:  Well, in order to come into court,

25   one needs to have standing.

1          THE COURT:  Right.

2          MS. POSWISTILO:  One needs to have a --

3          THE COURT:  Why wouldn't you have standing under these

4     circumstances for something as egregious as that?

5          MS. POSWISTILO:  Well, I agree the egregiousness of a

6     governmental statement does not confer standing on someone.

7     Standing, you have to show some kind of injury in fact.

8     Perhaps in that kind of situation, I was going to say that

9     perhaps informational standing would work, but that would again

10    be expanding what my understanding of informational standing

11    is.

12         THE COURT:  Well, what you did do was cite to Friends

13    of the Animals, I guess they call themselves, Friends of

14    Animals generally.  And Judge Rogers says that the existence

15    and scope of an injury for informational standing is defined by

16    Congress.

17         MS. POSWISTILO:  Sorry.  Defined by?

18         THE COURT:  Is defined by Congress.  And so I have to

19    look at where Congress defined that informational standing in

20    the context of the IQA and the APA.  And you're telling me that

21    there isn't.  So where do I find that in the statute?

22         MS. POSWISTILO:  There is none in the IQA.  The APA

23    does provide for judicial review in final agency action.  But

24    in a report, which would be comparable to the report in this

25    case, we're taking the position that is not a final agency

1   action.

2            THE COURT:  Well, I'll put that to one side for a

3   moment.  I really want to get to the standing question --

4            MS. POSWISTILO:  Okay.

5            THE COURT:  -- standing, as such, question.  So the

6   IQA makes certain directions that it seems to me defines the

7   available informational standing in cases like this, I suppose,

8   that depend, derive from the IQA.  Now, we'll get to the

9   question that I think is lurking in what the plaintiffs have

10  said, that there's some sort of independent APA responsibility

11  or role.  But I just want to understand for standing purposes,

12  is it the government's position that there's no standing under

13  the IQA and there's no standing under the APA, or are you

14  saying no, the APA, the way it's been read most recently, is

15  sufficiently capacious that anybody who has had agency action

16  that falls within the scope of it has got standing to go

17  challenge it?

18           MS. POSWISTILO:  I think that under the IQA -- it's

19  difficult to respond to a hypothetical, as Your Honor I'm sure

20  is 100 percent aware.

21           THE COURT:  Right.

22           MS. POSWISTILO:  But under the IQA, it doesn't create

23  a private right of action, which we all know is different from

24  standing.  But does the person bringing or does the entity

25  bringing, the astronomers who are bringing that action have a

1    concrete particularized injury in fact, and is there some kind

2    of economic or financial interests that would hurt them?

3    Probably no.  But it's more of an informational theory.  And

4    from an informational point of view, again, I don't see how the

5    way that concept has been developed throughout the years on the

6    informational standing the IQA itself gives them an absolute

7    right to --

8              THE COURT:  So -- I'm sorry to interrupt you.  But

9    it's two distinct analyses, that is to say you analyze standing

10   for purposes of the IQA and you say there isn't any; and then

11   you evaluate it for purposes of the APA?  And that's a distinct

12   determination?

13             MS. POSWISTILO:  It is a distinct determination.

14             THE COURT:  It is.

15             MS. POSWISTILO:  Yes, I would agree with that.

16             THE COURT:  So then let me just pursue this a bit.  So

17   let's assume that I say there is a final agency determination.

18   We're not going to correct.  Okay?  Put to one side what the

19   IQA seeks to do.  Final agency determination, which appears to

20   be here, is we're not going to correct this thing.  Thanks for

21   asking, but no.

22             Now, on that assumption, we move on to other aspects

23   of the APA and whether or not there is, we'll call it standing

24   but in any event a way for someone to go forward on it.  Is

25   there any additional role for the IQA under those

1    circumstances?  Does it inform the analysis in any way?

2         MS. POSWISTILO:  I think the agency's decision, if it

3    is within its discretion, would be blocked then from APA

4    analysis.

5         THE COURT:  Okay.  So now we're dealing with those

6    kinds of what I'll call exceptions from it, but the assumption

7    that I've given you is that an interested party, you know, a

8    bunch of astronomers, want to get some information.  They've

9    asked for it.  They've done it under the IQA.  There is no

10   other governing legislation.  And they've been denied.  Denied

11   both initially and on appeal.  They would, under that

12   hypothetical, at least, have standing to pursue it, wouldn't

13   they?  There may be exceptions from the APA, but they'd have

14   standing to pursue it, wouldn't they?

15        MS. POSWISTILO:  The APA deals with final agency

16   actions.

17        THE COURT:  And the assumption I made is --

18        MS. POSWISTILO:  I know I'm going back there.  I

19   understand you don't want me to be there but in order to

20   respond.  There is a right to judicial review, but that right

21   to judicial review has to affect that individual or

22   organization who is affected.  And for example, if a few cases

23   that were cited -- actually I think by plaintiff, Scanwell Labs

24   case where a disaffected bidder bids and found out that the

25   bidding, the procurement process was illegal or not done

1    correctly or whatever, the argument there was that person

2    doesn't have standing because he doesn't have a direct right to

3    the contract.  But there's that procedural standing which in

4    fact gave him that right.  That's one way to get standing.

5         THE COURT:  Okay.  But I'm really trying to narrow

6    down so I can understand what it is I have to decide.  I mean,

7    this is a classic what I think my job is, which is to decide

8    who decides.  And the issue here is do the courts decide?  And

9    if they don't, if you say they don't, why don't they?

10        And teasing that out just for informational standing,

11   the issue, it seems to me to be, both under the IQA -- but I

12   don't think the plaintiff is pressing the IQA, and it is kind

13   of a derivative, the IQA provides some basis for pursuing the

14   APA.  But in any event, the touchstone is whatever Congress

15   directed for informational purposes.  It is for procedural

16   purposes, too.

17        That is to say, a disaffected bidder has standing

18   because they've been injured by unfairness or corruption in the

19   bidding process.  But I think the analysis has to be through

20   the Congressional directive, and I'm trying to figure out what

21   is the -- what are the Congressional directives that are

22   particularly relevant here.

23        It seems to me that it's the IQA.  Whatever the IQA

24   means or doesn't mean or how capacious it is or isn't is

25   perhaps the beginning and the end of this case.  Maybe there's

1    some other mechanisms to deal with it.  But it seems to me that

2    for purposes of people who are affected by the IQA, that

3    plaintiffs here are affected by the IQA, it seems to me -- by

4    denial under the IQA.  Whether I can do anything about it is

5    another matter, but they're affected, and that it's final.

6         Now, nobody ever likes to hear that it's final.  They

7    will have appeals after appeals after appeals.  But Congress

8    provides a mechanism most of the time.  Sometimes it doesn't

9    explain what it's doing.  It just does it.  Using that form of

10   analysis, I want to get a better sense of what the government's

11   position -- I mean, government's position is no.  I understand

12   that.  But I'd like to unpack that a bit.

13        MS. POSWISTILO:  The government's position is if you

14   have a right by statute to information, then that is a first

15   step in determining whether there's information.

16        THE COURT:  Don't they have a right to information?

17        MS. POSWISTILO:  I think they have a right just like

18   all of the country has a right to information.

19        THE COURT:  Well, but they're also -- they actually

20   asked for it and they made -- they explained why it is that

21   they want the information and the kinds of activities that they

22   engage in.  That's not -- these aren't just people who dropped

23   out of the sky and said, by the way, we'd like to know, you

24   know, youth wants to know.  That's probably not standing, but

25   these are people who do this kind of work for a living, trying

1  to identify information for purposes of facilitating civic

2  conversation.  Let's put it that way.  And they're being

3  rejected by the government, which says we've gone through this

4  administrative process and we're not going to give you anything

5  more.

6          MS. POSWISTILO:  Well, Your Honor, again, we have to

7  go back to what it means to have informational standing.

8          THE COURT:  Right.

9          MS. POSWISTILO:  And in order for a plaintiff in your

10 scenario or for these plaintiffs to have informational

11 standing, one would have to expand the analysis of

12 informational standing because the only times in my research

13 that I discovered informational standing was appropriate is if

14 that individual had a right to the information to begin with.

15 FOIA is an easy case.

16         THE COURT:  But that's back to legislation.  FOIA is

17 some -- you're entitled to FOIA information because you file a

18 FOIA request.  You're a member of the community.  Nobody asked

19 you what do you need to know that for.  They just say, you

20 filed it, you went through the process, and now you have

21 standing.

22         MS. POSWISTILO:  That's my point, because there's a

23 statutory basis for it, and there's a statutory basis when one

24 looks at the intent of the statute and other statutes, for

25 example in the -- I have a bunch of cases here, the FEC v.

1    <u>Akins</u> case that dealt with the Federal Campaign Act, and that

2    required a public -- a political committee, if you're deemed a

3    political committee, to file all kinds of disclosure

4    information.  And the individuals, the plaintiffs in that case

5    filed suit because they said, Hey, we need this information,

6    and you, FEC didn't properly designate this person as a

7    political committee.

8         And in analyzing the statute, which needs to be done,

9    the courts determined that the intent of the statute or the

10   zone of protection of the statute included those individuals

11   who had an injury, and that injury was a voter's failure to

12   obtain relevant information.  But again, it goes back to a

13   statute.  This IQA statute doesn't have that kind of -- it's

14   more of a guidance and more of a proposal.

15        THE COURT:  Okay.  I understand that, but the language

16   is one of obtain.  That is, they can -- I guess it's always

17   helpful to actually pull up the statute and look at it.  So

18   what does the statute say?  It's also helpful to be able to

19   find it quickly when I keep putting things in the wrong files.

20   That's a judicial limitation.

21        MS. POSWISTILO:  Your Honor, I have just one copy, but

22   it's kind of highlighted.

23        THE COURT:  Well, I'm going to take it from you for a

24   dramatic reading.

25        MS. POSWISTILO:  Certainly.

1          THE COURT:  So we're really dealing with a note here,

2     and it makes a direction that the OMB provide policy and

3     procedural guidance to federal agencies.  That's what Congress

4     has told someone to do.  And part of that content of the

5     guidelines is in B.2.B "to establish administrative mechanisms

6     allowing effected persons to seek and obtain" -- "seek and

7     obtain" is what I was looking for -- "correction of

8     information."

9          So Congress has said, I think it's fair to read, that

10    some agency of the government has to establish administrative

11    mechanisms for effected persons to seek and obtain.  It doesn't

12    say courts.  It says administrative mechanisms for doing that.

13    So one looking at that, maybe it's failure to state anything

14    further, but one looking at it could say it stays in the

15    administrative agency.  Is that the thrust of what you're

16    saying about the standing here?

17          MS. POSWISTILO:  Yes, it is.  The "administrative

18    mechanisms" is somewhat unique terminology regarding -- in

19    statutes.  I haven't seen that before in any of them.  And to

20    me it sounds as a somewhat lower standard than a complete APA

21    review, et cetera.

22          THE COURT:  Well, but why?  Let me just pause for a

23    bit.  I agree with you that Congress has found a new

24    formulation here.  One could say, Well, they're just saying

25    this is what administrative agencies are supposed to do, but

1    we're not giving the courts any warrant to police that.

2         On the other hand, one could look at the

3    Administrative Procedure Act and say that agency action has

4    made review, made reviewable by statute and final agency action

5    for which there is no adequate remedy in a court.  Now, if what

6    this says and the statute is there's an administrative

7    mechanism and administration is going to take place under the

8    APA, or administrative activity is going to take place, which

9    is the province of the APA, the APA has said there's no

10    adequate remedy, then these things are subject to judicial

11    review, hasn't it.

12         MS. POSWISTILO:  It says -- number one, what we need

13    to remember is in both the IQA itself, it speaks in terms of

14    guidelines and goals.  There's absolutely no intention

15    whatsoever set forth by Congress as to what it was.

16         THE COURT:  How do I know what their intention is

17    here?  They haven't said it.  They've said we want OMB to

18    create administrative mechanisms, and then administrative

19    mechanisms are created, and they provide a mechanism by which

20    someone seeks and presumably hopes to obtain, and their hopes

21    are dashed.  And then under the government's -- under your

22    theory, at least as I understand it, nothing further happens.

23    No further review.  And what I'm pointing to is this aspect of

24    the APA that says there's no other adequate remedy in a court.

25         MS. POSWISTILO:  And I don't believe there is in this

1    situation.  Now, again, APA says more judicial review based on

2    final agency action, and I am taking the position a report is

3    not a final agency action.

4            THE COURT:  Now, that's the --

5            MS. POSWISTILO:  It's something --

6            THE COURT:  Maybe I'll take you up on this one now

7    rather than just ask you to accept my hypothetical.

8            MS. POSWISTILO:  I just can't answer -- I don't know

9    how else to answer.

10           THE COURT:  So let me say this.  We're not talking

11   about reports or anything like that.  We're talking about

12   someone who comes to the agency, like someone who writes

13   requests for Freedom of Information Act information, and the

14   agency says no, and that's our final -- what part of "no" don't

15   you understand?  It's N-O, no.  You can't have it now.  The

16   FOIA has a particular mechanism, very specific mechanism, but

17   the agency action that we're talking about here is the decision

18   of the agency not to provide information."

19           So here we're talking about the agency says, "We're

20   not providing any more information.  You may not obtain any

21   more information in this matter."  Why isn't that reviewable

22   under the APA as a final agency action?

23           MS. POSWISTILO:  Well, it's not a final agency action

24   as that term has been defined.  It's not required -- and I'm

25   just trying to find my notes to get out the --

 1          THE COURT:  I'm the last person who could deny you the

 2    opportunity to look for your notes since I can't find mine.

 3          MS. POSWISTILO:  Final agency action has a specific

 4    definition.

 5          THE COURT:  If we can just -- while you're pausing,

 6    we're going to pause because apparently Mr. Lanard's call was

 7    dropped, so Ms. Beatty is going to perform some magic and get

 8    him back here.

 9          Mr. Lanard?

10          MR. LANARD:  Yes, Your Honor.

11          THE COURT:  Pardon me?  You can mute your line here, I

12    think we can go forward.  And if we have another problem, you

13    can dial Ms. Beatty again.

14          MR. LANARD:  Thank you.  I'll do that now.

15          THE COURT:  Go ahead.

16          MS. POSWISTILO:  Final agency action, there has to be

17    two conditions to be met for that action.  One, it's a final

18    consummation of the agency's proceedings, which in your

19    scenario is what we have.  But more importantly from my

20    perspective, is a second piece of it, which says that the

21    action must be one by which rights or obligations have been

22    determined or from which legal consequences flow.

23          Now, the only legal consequences that can even be

24    pointed to in this situation is the IQA, and it's going to be a

25    somewhat circular argument because my position is the IQA

1  creates no legal consequences, so there's no final agency

2  action because there are no legal consequences.

3         THE COURT:  Well, you say that, and the problem I have

4  with it is that it does.  It just says under your analysis, or

5  at least as I understand your analysis or perhaps as I might

6  reframe your analysis, it is that it creates action or creates

7  rights and affects rights, but they're not reviewable in the

8  courts.  And that's because the IQA doesn't make them

9  reviewable.  I mean, it does keep circling back to the IQA, it

10 seems to me.  I mean, I'm trying to dovetail some competing

11 considerations I suppose --

12        MS. POSWISTILO:  Understood.

13        THE COURT:  -- in making this judgment, but I can't

14 see that someone doesn't have some right to obtain some

15 information.  Put to one side whether what they're seeking is

16 information as opposed to confirmation of things they already

17 know, but I'll put that to one side.  They've been provided

18 with a statute that says you can seek and obtain.  And you've

19 got an administrative agency that says, "We're not giving you

20 anything more."  Now, "seek and obtain" has to mean something,

21 right?  What does it mean?  If it doesn't mean that they've --

22 they've got a right to something.

23        MS. POSWISTILO:  They can seek and obtain from the

24 agency.  If Your Honor wants to pull this into the APA, there

25 would certainly be a -- there needs to be a much more confirmed

1    Congressional intent, which there is nothing here.  There's no

2    legislative history.  What you are suggesting should you rule

3    that there is a right to obtain information is that any --

4    every report, every statement, everything that ever comes out

5    of the government, as long as someone writes a letter to an

6    agency, an agency says no, the courts are then going to be

7    faced with judicial review of competing data, competing

8    statistics, underlying data or even the biases of a particular

9    group that did these statistics.  And that is --

10          THE COURT:  Okay.  So I think I understand that

11   without necessarily embracing the full parade of horribles that

12   you've unfolded.

13          So now you're telling me -- I think you're telling me

14   that I have to look at this and say, "What did Congress mean?"

15   Is that the basis for making this kind of evaluation?  What did

16   Congress mean under these circumstances?  Did they mean simply

17   to keep it in-house?  Because they didn't quite say that.  One

18   could infer it by saying "administrative mechanisms," but they

19   didn't quite say that; or do I look at what it was that was the

20   goal.  The goal is to have quality information available, and

21   there are standards and guidelines and that sort of thing that

22   people are supposed to adhere to.  You're telling me, and maybe

23   you're right, that Congress has to be very explicit to say that

24   the courts have a role in all of this.

25          MS. POSWISTILO:  I believe it does, Your Honor.  I

1    think that given the way the case law has developed under the

2    APA and under informational standing, if we want to pull that

3    in again, there absolutely has to be some look at the statute,

4    some look to see if that statute guarantees you a right to

5    information, which the IQA does not, and whether if you are

6    denied that statute or that information, are you injured.

7           And again, we have the kinds of cases I described

8    before, the voters' injury, Endangered Species Act where there

9    is an informational -- I'm going back to informational standing

10   where there's been a defined informational standing by some

11   courts.  And that is not here.  This is a goal of agencies.  It

12   is a goal for the agencies to perform to.  And the OMB

13   guidelines themselves say these are performance goals.  You are

14   to strive for this information.  There's no --

15          THE COURT:  Without unduly permitting the agencies to

16   tell us what the statute means or for the DOJ to say it confers

17   no rights.  I think that's ultimately for the courts to decide

18   here in deciding what the nature of the activity is and what it

19   was that Congress wanted to happen.

20          You say it's aspirational.  They wanted to let the

21   agencies go at it under the general supervision of OMB.  Okay.

22   I'm still back to this question of can the courts be involved.

23          Let's say I took it one step further.  If the statute

24   actually said create administrative mechanisms subject to

25   judicial review, we wouldn't have a fight about this, would we?

 1              MS. POSWISTILO:  I certainly wouldn't --

 2              THE COURT:  From you?

 3              MS. POSWISTILO:  No.

 4              THE COURT:  Okay.  So then you'd be into your other

 5     arguments about discretion and that sort of thing I think.  So

 6     it comes down to what do we do in the face of Congressional

 7     silence on this issue that doesn't provide one way or the other

 8     for a judicial review from which we might be able to infer that

 9     they meant to keep it an intramural exercise of permitting

10     people to seek and perhaps obtain what they want.

11              MS. POSWISTILO:  Well, Your Honor, I don't believe

12     that this is a kind of statute that Congress wanted the

13     judiciary to be involved in because, again, it goes down to the

14     nitty-gritty, factual statements and what have you put out by

15     -- put forth by an agency.

16              Take the plaintiff's case, for example.  If the agency

17     publishes a report, and the plaintiffs, they know certain

18     information and they want all of this other information in the

19     report, you need a Congressional mandate in order to get that

20     to have that enforceable.  That's not here.

21              THE COURT:  But why is that?  I mean, we're on a

22     spectrum.  I mean, I can see all kinds of reasons, prudential

23     reasons, policy reasons for saying don't throw this into the

24     courts.  It's too open-textured.  It doesn't lend itself to

25     principal judicial review.  But with a couple of more tweaks of

1    the language, it could happen.  It's not that the policy is

2    wrong.  It's whether or not we have an expression here of that

3    policy here by Congress or in the absence of an express

4    statement of that policy, we just say you can't have judicial

5    review.  I think that's what this is about.

6            I mean, there's all this stuff.  You know, I've read

7    these cases until my mind has become numb trying to figure out

8    what the principles are involved, and I'm trying to tease them

9    out in some way other than just say, "Oh, this is like that

10   one, but it's not like this one."  And the best I can come up

11   with from your position, although obviously I'm going to hear

12   from your friend about or he's going to hear from me about the

13   limitations of his, is nobody could ever believe that Congress

14   meant to do this.  And until we've got some express statement

15   by Congress or something clearer than what we have now, we

16   can't have judicial review.

17           All the other stuff seems to me to flow from that,

18   unless I'm missing something.  You can say there's this case,

19   there's that case.  I'm just trying to tease out the

20   fundamental theories involved.  But isn't that what it's all

21   about?  What did Congress mean?

22           MS. POSWISTILO:  It is what it is all about, because

23   there's no legislative history, again, to go back to, we have

24   to look at the fact that this was --

25           THE COURT:  Even assuming that I would look at

1     legislative history under these circumstances, I look at the

2     language.  There's the language, and the language has me

3     guessing a little bit.

4           Now, there are default rules for guessing about

5     whether or not Congress means to provide judicial review.

6     Certainly in very complex reticulated regulatory regimes, the

7     Supreme Court has been pretty tough about making sure that

8     there's a Congressional statement.  On the other hand, there

9     are others in which they've said, Oh, they probably meant it.

10    I'm going to let them have it.

11          MS. POSWISTILO:  Your Honor, I think going back to the

12    IQA, and the terminology "established administrative

13    mechanisms" is key in that analysis because it would have been

14    not an issue and it is done all the time.  They could have said

15    "administrative mechanisms establishing the judicial review" or

16    anything like that, but it's "administrative mechanisms."  I

17    haven't seen that ever.  And again, that suggests to me that

18    it's a way for the agencies to achieve their performance goals

19    of openness and whatnot, but it's not a right to the group, the

20    entity or the individual who wants a report corrected.  It just

21    -- it's just not there.  It's just not in the statute.  It's

22    not provided in any other manner of law, nor is it provided for

23    in the APA.  And to the extent that it doesn't sit right, it

24    may not sit right, but this cannot be the kind of statute

25    that's opened up to judicial review, again, putting aside all

1   the other APA types of arguments that are there.

2        THE COURT:  Okay.  So your turn.  And really it comes

3   down to this.  No direction, no specific express direction.

4   Does that mean by default it becomes judicial review?

5        MR. HUNT:  Yes, precisely.  That's precisely what the

6   APA does.  It creates a presumption of judicial review.  We

7   would say that the government is trying to flip the presumption

8   saying that because --

9        THE COURT:  Maybe I -- I mean, I'll let you make your

10  argument about the statute.  But why presumption?  I mean, why

11  isn't what my role, what my judicial role is is to figure out

12  what Congress wanted.  And so Congress uses language and fails

13  to make directions.  Why am I not supposed to honor that at

14  least in certain cases?

15       MR. HUNT:  We think you would be honoring Congress's

16  intention because Congress was legislating the IQA in the

17  backdrop of the APA.  It was well aware that the APA existed.

18  It was well aware that courts --

19       THE COURT:  Then that means that every time there is

20  an administrative action and it's final that someone is asked

21  for, which is probably about as much as you need to do to

22  establish being an affected person under these circumstances,

23  there's judicial review.  Any administrative action there's

24  judicial review because you've now untethered it from whatever

25  directions the IQA provides.

1          Because if I look at the IQA, in candor, it talks

2     about administrative mechanisms, and that strikes me, at least

3     my initial reading of it, keeping myself blinded from

4     legislative history that doesn't exist, is that means

5     intramural.

6          MR. HUNT:  So we would suggest that what courts have

7     said is the APA requires judicial review unless there's clear

8     and convincing evidence to preclude that review.  Silence is

9     not enough to preclude review and we've cited cases --

10         THE COURT:  But there are cases that run the other

11    way.  Justice O'Connor was talking about them in what I call a

12    reticulated kind of regulatory regime that basically says

13    you've got to be explicit about judicial review under those

14    circumstances.  Now, saying "clear and convincing evidence"

15    doesn't do a lot for me, frankly.  I mean, what it suggests is

16    it's got to be really serious, but beyond that it doesn't tell

17    me very much.

18         MR. HUNT:  So we would suggest here there's a couple

19    of ways that you can know that there should be a -- that you

20    should honor the presumption of judicial review.

21         First is, again, the silence is not enough.  This is

22    not a super-complicated administrative scheme that Congress has

23    laid out.  There's no -- in a lot of those contexts, like with

24    federal employees there's a separate administrative board

25    that's set up that's independent from the agency, like the

1   Merit System Protection Board.  We don't have any of those

2   types of facts in this statute.  We have a very straightforward

3   administrative adjudication process.

4           THE COURT:  But what that suggests is that you don't

5   even need those separate boards or those separate statutes,

6   that any time there's an administrative agency and someone is

7   adversely affected by that administrative agency and they're

8   interested, (snaps fingers), into the APA.

9           MR. HUNT:  Yes, unless Congress says otherwise.

10          THE COURT:  Okay.  So what we have is a kind of mixed

11  setting, and the mixed setting is this:  that Congress speaks

12  pretty specifically about things like the FOIA or things like

13  that, and I think the thrust of what you're saying or the

14  implication of what you're saying is that's supererogatory.

15  Don't need it really because it could be you can go, rather

16  than the scenic route through the FOIA, you could go the direct

17  route through the APA.

18          MR. HUNT:  Yes, and the APA first of all textually

19  suggests that this is supposed to be a fallback if Congress

20  doesn't create a specific mechanism.  But the reason that

21  Congress could want to create a specific mechanism, it could

22  want to narrow the provision.  And there's a Medicare Act

23  provision, for instance, where it essentially says you have to

24  exhaust all of your administrative remedies before you go to

25  court.

1          THE COURT:  But that's a finality issue.  You had to

2     do that here.  You did it, I think, but you had to do that

3     here.

4          MR. HUNT:  My point here is that when Congress wants

5     to create a review that is not through the default APA, it does

6     so expressly, and it might -- one of the reasons it might want

7     to do that is to impose a finality requirement or to narrow the

8     scope of what a court can review.  It's not doing anything

9     here.  It just has an agency --

10          THE COURT:  Okay.  So -- sorry to interrupt, but so I

11     keep the thought --

12          MR. HUNT:  Yes, please.

13          THE COURT:  So what you're saying is the default is

14     final administrative action -- I know Ms. Poswistilo says

15     that's not this -- but final administrative action no matter

16     what, unless Congress has said no, is reviewable by judicial

17     review.

18          MR. HUNT:  Yes.  I think you have a little bit more

19     than mere final administrative action here.  I think the text

20     of the statute points the court to the Paperwork Reduction Act,

21     the purposes that Congress laid out in the Paperwork Reduction

22     Act, one of which is accountability to the public.

23          THE COURT:  But, you know, so let's step back to think

24     about that as a matter of public policy, and I'll think about

25     it in terms of job description, mine.

1          Why would the courts be engaged in this kind of

2     continual review of the full range, in the absence of a

3     Congressional direction that you can't do it, of that sort of

4     thing?  What kind of way to run a railroad is that?

5          MR. HUNT:  We think it's important in precisely this

6     type of circumstance where the agency refuses to correct

7     information even when it's admitted that at least one of the

8     facts are wrong.  It refuses to give the context.

9          THE COURT:  What isn't -- I mean the redressability

10    that you're talking about is judicial blue pencil.  That's

11    really what you want, I think.  That's what you're asking for

12    here.  It is -- you know, there's laced in here some suggestion

13    that you haven't obtained information that you want.  Maybe

14    there's some aspect of that, but the fundments of this is you

15    just think they're plumb wrong and somebody ought to re-write

16    their report to make it better.  And that I think is the relief

17    that you want from me.

18          I suppose I can send it back, remand it and say do

19    better and then they come back and they don't.  Then at some

20    point you're going to be saying, "Judge, what you should do is,

21    here is all the information.  Let's put it in context.  You

22    should put in parentheticals about the dissent opinion just

23    like we didn't in our brief.  You should make reference to

24    particular informational statutes just like we didn't in the

25    brief."  And that way -- not to turn the screw -- is madness,

1    it seems to me.

2         MR. HUNT:  Your Honor, this type of thing comes up all

3    the time in courts reviewing agency action under the APA.

4    Obviously the agencies have some amount of discretion under the

5    APA.  This is, what we're asking for is run of the mill

6    arbitrary and capricious review.

7         THE COURT:  But it happens in this context.  I try to

8    think of the times when it really happens.  Now, part of this

9    is you've got people who don't have a financial interest, and

10   there's not a necessity for financial interest, but it's harder

11   to think in those terms since financial interests seems to make

12   the world go around.  But ordinarily you get administrative

13   review and somebody as mad as hell because the government

14   hasn't done something that advances some project of theirs or

15   doesn't stop some project of somebody else's.  But Bluebook

16   review responsibilities don't really exist in the case law as I

17   see it.

18        I mean, if you can think of something that comes close

19   to that, something that says, "For no other reason than to get

20   it right, you, Judge, should re-write what the agency did.  No

21   implications, nothing other than 'the truth will out,'"

22   whatever that is.

23        MR. HUNT:  We don't think we're asking the court to

24   re-write --

25        THE COURT:  Perhaps not, but first answer my question.

1    Anything else that comes close to that?  Kind of Bluebook

2    revision.

3          MR. HUNT:  Well, there are instances.  In the

4    Endangered Species Act case, the Bennett case, there was a

5    statute in the Endangered Species Act that essentially said you

6    had to use the best available information or something a little

7    bit more specific than that.  And the court found that that was

8    subject to judicial review under the APA.

9          THE COURT:  In connection with the Congressional

10   direction.  So then we're back to this point of the

11   Congressional direction.  Where do I look?  I look at the IQA,

12   and I can't say that the Congressional direction is so clear.

13   I mean, we all want something that we can fully rely upon.  I

14   don't think I'm finding it.  In more candid moments you

15   probably would say maybe it's not as good as it could be.  But

16   I'm just looking for something that comes close to this and not

17   just, you know, making a statement by the agency.  It's the

18   statement that has something to do with some activity that

19   people are engaged in that either gets advanced or stopped.

20          I can't think of anything that comes close to this.

21   Certainly not -- maybe you're telling me that there are going

22   to be a wave of paperwork reduction cases that will clutter my

23   docket, like the paperwork.  I don't that's going to happen.

24   And that so I want to look at something that ties me to this in

25   some fashion.

1          I mean, this is not a pop quiz.  If you've got

2     something, you'll tell me about it.  I'll give you a couple of

3     days to tell me about it.  That's really what I'm looking for

4     here.  This is a strange bird, I guess, and nobody has -- you

5     know, the case law has tried to deal with the traditional

6     language of APA and standing and so on, not in a fashion that's

7     satisfactory to me.  So I'm looking for some way to understand

8     this more fully other than to say there's a case that says this

9     but to understand the guiding principle.

10          MR. HUNT:  We would say that the guiding principle is

11     it's a standard review of the agency denial of a petition.

12     There's clear standards.  In the IQA it says "quality,

13     objectivity, utility and integrity."  That language has been

14     explained quite in depth by OMB, enough that OMB at least

15     thinks that the public can understand whether any given report

16     is compliant with the OMB guidelines.  And then this court

17     looks at that adjudication, does not re-write the report to be

18     clear, just looks at the reasons that the agency has given for

19     taking whatever action the agency did or didn't do and either

20     rejects the petition because the agency has complied with the

21     law and has not acted arbitrary and capriciously, has

22     considered all of the factors that Congress has laid out, or

23     finds that it didn't do one of those things and then it vacates

24     the denial of the petition and sends it back to the agency.

25          THE COURT:  But what you're asking for is to obtain

 1    information.  That's the point.

 2          MR. HUNT:  Right.

 3          THE COURT:  And that's why I go back to this idea that

 4    what you would like is an alternative version of a report, a

 5    report that is more capacious and a report that says let's just

 6    talk about terrorist activity.  It's not just aliens.  It's

 7    homegrown.  In fact, more of it is homegrown than it is aliens.

 8    That's what you'd like -- I'm not telling you what you'd like,

 9    but I think you would think that is more accurate than what is

10    provided here.

11          And so what you're asking is for an editorial function

12    on the part of the court.  This is just a little bit hard to

13    get my hands around.  I mean, you know, I'm happy to write

14    reports.  On the other hand, I'm not sure that we can ever come

15    to conclusions that we've done a good enough job on that.

16    There will always be people who disagree about reports.  And so

17    where do we provide standards of dealing with this?

18          MR. HUNT:  Well, obviously line-drawing is a tough

19    function that this court does all the time about when

20    exactly --

21          THE COURT:  Not on something like this.  That's why I

22    keep asking this question.  Show me something else where they

23    say, "Here, Judge, re-write this, or tell us what the proper or

24    an acceptable, plausible version of a report would be."  I'm

25    not sure what the standard would be.  You say arbitrary and

1    capricious.  I don't know.  Is it arbitrary and capricious to

2    say, to focus on 20 percent, if that's the figure, of terrorist

3    activity being by aliens and 80 percent being homegrown people

4    and only talking about aliens, is that arbitrary and

5    capricious?  I don't know.  But the point is it's not a

6    standard that has been deployed to my knowledge anywhere.

7         MR. HUNT:  So first, I'm not aware, at least standing

8    here right now, of a statute that allows a court to re-write

9    reports.  But again, we're not asking the court to re-write a

10   report.  We're asking the court to apply the standards that

11   have been laid out here.  OMB has defined objectivity.  It says

12   that the agency is to evaluate whether the presentation was

13   accurate, clear, et cetera, whether there was adequate context.

14   It asks whether the substance itself is unbiased.

15        THE COURT:  One hopes that a remand would lead to

16   something further.  That's the hope, I guess.  But I want to

17   look down the line farther:  The obdurate agency that says you

18   got what you got.  And so what is the relief when you have the

19   obdurate agency?  Not Ms. Poswistilo, who will be eminently

20   reasonable, but the clients she serves might not be.

21        MR. HUNT:  Well, in that case I think that the APA

22   provides for an injunction, and this court can order the agency

23   to at least consider these factors, and, if the agency is

24   refusing to do so, the court can, just like with any other

25   party who is refusing to comply with an injunction, could order

1  sanctions.

2         THE COURT:  Hold them in contempt?

3         MR. HUNT:  Yes.

4         THE COURT:  Right?

5         MR. HUNT:  I mean, hopefully it's our presumption that

6  the government will follow this court's orders.

7         THE COURT:  Think broadly.  This is contempt for

8  inaccurate discussion of matters of public concern.  I'm not

9  sure that's a direction that the courts should be going in.

10  And maybe the direction is to say, Look, there are mechanisms

11  for dealing with something like this, and the mechanisms are

12  political.  Congress doesn't like this.  Then they can be more

13  precise.

14         But to say that the courts kind of wade into it

15  because as the branch of last resort, or maybe first resort

16  nowadays, it seems to me a dangerous kind of thing.  Those are

17  all background things that are designed to try to facilitate an

18  understanding.

19         MR. HUNT:  I understand that.  And I think here this

20  is exactly what Congress did when it passed this.  It said that

21  it was unhappy with how -- the quality of information that had

22  been promulgated and said we need to make a legal requirement.

23  The OMB guidelines in fact admit that there was already an OMB

24  circular A130 that says that agencies already have in place

25  well-established informational quality standards and

1    administrative mechanisms that allow persons to seek and obtain

2    correction of information.  Congress decided that what the

3    agencies were doing on their own wasn't enough.

4         THE COURT:  No.  They said create guidelines to say

5    here's what you should be doing.  But they didn't say -- we all

6    agree, I think.  They didn't say and the courts shall police

7    this.

8         MR. HUNT:  But --

9         THE COURT:  If I may.  I think you say the background

10   is this is done in the context of the APA and they're going to

11   do it so Congress didn't have to say it.  I think that's what

12   you're getting it.

13        MR. HUNT:  Right.  And there's a quote from the

14   Cousins decision in the First Circuit that says one of the

15   purposes of the APA was so that Congress could just say we're

16   going to mandate an administrative adjudication or some sort of

17   administrative action, and we know that there's going to be a

18   check to make sure that the agency doesn't go beyond what we

19   intend it to go.

20        THE COURT:  The problem with those citations is that

21   they're untethered to particular circumstances.  And so I look

22   at the particular circumstances here, which seems to me not to

23   provide understandable standards entirely and to be inviting me

24   into uncharted waters of various kinds.

25        MR. HUNT:  Your Honor, we think obviously the meaning

1    of quality and objectivity and utility, that's a merits

2    question, but we're happy to provide more briefing on it.  But

3    also, these aren't random words that Congress slapped into the

4    statute.  These are words that appear throughout the Paperwork

5    Reduction Act.  They're words that, as the OMB guidelines

6    admit, have been used in information resource management,

7    agency information resource management for years.

8              THE COURT:  That gets me back to this.  I have another

9    matter on, unless there's something else that hasn't been

10   discussed fully here, at least broadly discussed in the

11   briefing and so on.

12             I'll give you a couple of days to show me, you know,

13   something that looks like that that involves the court in

14   making determinations that basically require obtaining

15   information, just obtaining information, that could provide me

16   with some guidance of what I'm supposed to be doing.  I think

17   in the traditional way -- this may be a limitation of

18   imagination, but I think in traditional ways about APA things.

19   Talk about, you know, environmental impact statements.  I mean,

20   that's -- you want to get full information, the courts police

21   it, but it is to the determination of whether or not a project

22   goes forward or doesn't, and there's a way of dealing with that

23   to say, You get one more shot at it -- maybe you say that to

24   the agency -- and you don't do it right, then the default is it

25   either goes forward or it doesn't go forward.  But the courts

1    don't get involved and then say we are now going to write our

2    final EIS.  There's nothing like this that I'm aware of.  But

3    you're going to have some time to point me to it so I can feel

4    more comfortable in the new role that you've outlined for me.

5            MR. HUNT:  We're happy to provide supplemental

6    briefing.  We would -- also we would suggest that, assuming a

7    court finds that an agency has violated the IQA and has vacated

8    an action, there's going to be an opinion that lays out why the

9    agency has violated the law and that we assume would provide at

10   least some guidance that the agencies will then comply with.

11   And so I think --

12           THE COURT:  They'll comply with it by saying, "The

13   court said this."  Okay?  So maybe that's valuable.  Maybe that

14   means that what this statute was really all about was to induce

15   unelected judges to offer their gratuitous observations about

16   matters of public concern.  I don't think so.  And so I'm

17   trying to find something that tells me that's consistent with

18   the judicial role, which is a limited one, generally, and

19   dictated in these circumstances by what Congress says that

20   tells me what I should be doing about this thing.  I mean,

21   periodically, somebody comes in and says they've got it wrong

22   and then I'm supposed to unburden myself of why they got it

23   wrong with greater or lesser detail.  I'm not sure James

24   Madison had that in mind.

25           MR. HUNT:  We would encourage the court not to create

1    a general rule on the assumption that the government will do

2    everything it can not to follow this court's orders.  I think

3    there's a presumption of regularity --

4         THE COURT:  Sure.  And if there is a presumption of

5    regularity, then it can be dealt with by administrative

6    mechanisms.  It doesn't need judicial review.  We're all

7    talking in generalities.  I'm not looking for massive

8    supplemental briefing.  I am looking for something that tells

9    me that here is something that's pretty close to this that

10   courts have done and that deals with something more than or --

11   I don't know about more than -- but has the framing information

12   that's similar to framing information here.  Because I do think

13   this is about the IQA, and the APA is the mechanism for

14   vindicating the IQA that you're asking for, but it is tethered

15   to the IQA.  Whatever Congress wanted to do with the IQA is

16   what I'm supposed to do using the mechanisms of the APA.

17        That's I think where this goes for me.  And so if

18   you've got things that come close, not just say here is a case

19   for informational standing that turns out to involve animals

20   but something that involves pure information or something

21   closer to pure information than those kinds of matters, I'd

22   like to know about them, even identifying parenthetical

23   dissents but also identifying exactly what the statute is,

24   because I go back and look at the statute and try to figure it

25   out.

1          That's what I'm trying to deal with.  I'm not

2     altogether comfortable, I have to say, you might have gathered,

3     with the cases that exist now on this.  They're not as, I don't

4     know, rigorous as I would like --

5          MR. HUNT:  We would agree.

6          THE COURT:  -- that analysis.  That doesn't mean I

7     won't follow them or follow the results, but it does mean that

8     I want to be sure that I've done as rigorous an analysis as I

9     can do in dealing with it.

10         MR. HUNT:  Yes, Your Honor.

11         THE COURT:  Okay.  So something by next Monday.  Is

12    that okay?  This is not a test of manhood or womanhood.  Just

13    quickly, because I have a short memory if you don't get it to

14    me promptly.  Wednesday next week?

15         MR. HUNT:  We'll get a supplemental brief --

16         THE COURT:  So I think Wednesday is a reasonable

17    amount of time to do it without imposing undue burdens.

18         MR. HUNT:  Is there a page limit?  I understand you

19    don't want --

20         THE COURT:  Whenever -- members of my staff hear this

21    all the time, but you haven't yet so I'll inflict it on you.

22    Whenever lawyers come in here and ask how long the closing

23    argument is supposed to be, I tell them there was a president

24    of Yale in the end of the 19th century who was frequently asked

25    the question by preachers at Battell Chapel, "How long should

1    the sermon be?"  And he would invariably respond, "No souls are

2    saved after 20 minutes."

3            Now, I think you're trying to save a soul here, and so

4    concision would be important.  But I'm a member of the clean

5    plate club.  I read whatever you write.  I may get indigestion,

6    but I will read whatever you write.

7            MS. POSWISTILO:  Your Honor, would you like a response

8    from the government?

9            THE COURT:  Not a response.  A simultaneous offering

10   about it.

11           MS. POSWISTILO:  Yes.

12           THE COURT:  You both know what's on my mind, I think.

13   There's no big surprise here.

14           MS. POSWISTILO:  Understood.

15           THE COURT:  But that's just something that comes --

16   you produced a lot of -- both of you produced a lot of cases.

17   Maybe there aren't any more cases on it, but you know what I

18   want to look at.  And if you say there are no more but maybe

19   you want to look more particularly at this issue, that would be

20   helpful.  Whatever you think is particularly responsive to the

21   way in which this argument has proceeded.  Okay?

22           MR. HUNT:  Of course.

23           THE COURT:  All right.  Thank you very much.

24           (Adjourned, 3:40 p.m.)

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3             I, Kelly Mortellite, Registered Merit Reporter

 4   and Certified Realtime Reporter, in and for the United States

 5   District Court for the District of Massachusetts, do hereby

 6   certify that the foregoing transcript is a true and correct

 7   transcript of the stenographically reported proceedings held in

 8   the above-entitled matter to the best of my skill and ability.

 9                    Dated this 8th day of December, 2019.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```