UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PROTECT DEMOCRACY PROJECT, INC., BRENNAN CENTER FOR JUSTICE AT NEW YORK UNIVERSITY SCHOOL OF LAW, MICHAEL F. CROWLEY, AND BENJAMIN WITTES,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF HOMELAND SECURITY, WILLIAM PELHAM BARR in His Official Capacity as Attorney General of the United States, and CHAD WOLF[1] in his Official Capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | Case No. 1:18-cv-10874-DPW |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

The Information Quality Act ("IQA") explicitly affords plaintiffs a right to "seek and obtain correction of information maintained and disseminated by [an] agency that does not comply with the guidelines" promulgated under the statute to "ensur[e] and maximize[e] the quality, objectivity, utility, and integrity of information . . . disseminated by the agency." Pub. L. No. 106-554 § 515(b)(2), 114 Stat. 2763, 2763A-154 (2000).  The question presented here is whether an agency's adjudication under the administrative mechanism established by this statute is judicially reviewable.  Because Congress created this new requirement for agencies to adjudicate "correction" petitions against the backdrop of the APA's judicial review mechanisms

---

[1] Substituted for Acting Secretary McAleenan.  *See* Fed. R. Civ. P. 25(d).

1

without expressly precluding a judicial role, the answer is yes. *See* Opposition to Defendants' Motion to Dismiss the Amended Complaint, Dkt. 43 ("Opp."), at 19-21.[2] The APA obliges the Court to review the Agencies' disposition of Plaintiffs' petition for correction under its § 706 standard to evaluate whether the Agencies' determination that the Report warranted no correction under the IQA was arbitrary and capricious or contrary to law. *Id.* at 22-27.

The Court has asked Plaintiffs to identify contexts that illuminate the proper role for courts reviewing agency actions under standards analogous to those set forth in the IQA. Plaintiffs submit the following examples of contexts in which courts perform a similar function under the general auspices of the APA:

<u>Biological Opinions</u> - Congress requires that the Fish and Wildlife Service promulgate biological opinions determining whether other agencies' actions will adversely impact endangered species, and advise the relevant agency on alternatives to avoid jeopardizing the endangered species. 16 U.S.C. § 1536(b). As Plaintiffs explained in their Opposition, the Supreme Court has held that despite Congress's silence in the organic statute requiring biological opinions, the APA provides for judicial review of whether these biological opinions comply with the statutory requirement that the agency "use the best scientific and commercial data available." *See Bennett v. Spear*, 520 U.S. 154, 176-78 (1997) (APA authorizes review of challenge that the "best scientific and commercial data available" showed the agency's biological opinion was wrong and that proposed project would not have an impact on endangered species). Courts have set aside biological opinions that fail to do so. *See, e.g., Dow AgroSciences LLC v. Nat'l Marine*

---

[2] At oral argument, the Court noted that Plaintiffs had failed to identify citations drawn from a dissenting opinion. Plaintiffs have reviewed the citations in their brief and acknowledge with regret that those designations were omitted in two instances. *See* Opp. at 20 (citing *High Country Citizens All. v. Clarke*, 454 F.3d 1177, 1199 (10th Cir. 2006) (Briscoe, J., dissenting) *and Dep't of Transp. & Dev. of La. v. Beaird-Poulan, Inc.*, 449 U.S. 971, 973 (1980) (Rehnquist, J., dissenting from denial of certiorari)). Plaintiffs apologize for their error, and would be willing, with the Court's permission, to submit a corrected brief.

*Fisheries Serv.*, 707 F.3d 462, 472-73 (4th Cir. 2013) (setting aside biological opinion in part for its reliance on "highly criticized" data the deficiency of which the agency acknowledged); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) (setting aside biological opinion that ignored report contradicting data on which agency relied).

    <u>Consumer Product Safety Information Database</u> - Congress created a public database in which the Consumer Product Safety Commission makes public reports of unsafe consumer products; if the Commission receives notice that information is wrong, the Commission must remove the information, correct it, or add sufficient additional information if it determines the information is "materially inaccurate or duplicative."  *See* 15 U.S.C. § 2055a(c)(4)(B).  While Congress was silent in the organic statute on judicial review of these determinations, the District of Maryland has held that the agency's adjudications of challenges to the accuracy of the reports in its database were reviewable under the APA.  *See Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 461-62 (D. Md. 2012) (enjoining publication of report connecting child carrier to child's death when not clear death was connected to carrier).

    <u>National Practitioner Data Bank</u> - Congress established a database publicizing hospital investigations of doctors, and authorized the Department of Health and Human Services to promulgate regulations providing for "procedures in the case of disputed accuracy of information" included in the database.  *See* 42 U.S.C. § 11136.  The agency thereafter set up a limited informal adjudication process.  *See* 45 C.F.R. § 60.12.  While Congress was silent on judicial review in the statute creating the database, the First Circuit and other courts have nevertheless exercised their general power under the APA to review these adjudications for compliance with the regulations.  *See Doe v. Leavitt*, 552 F.3d 75, 82 (1st Cir. 2009) (agency properly determined plaintiff was still under "investigation" as required by statute even after his

resignation when it "consulted appropriate sources, employed sensible heuristic tools, and adequately substantiated its ultimate conclusion"); *see also Leal v. Secretary*, 620 F.3d 1280, 1284-85 (11th Cir. 2010) (declining to set aside agency report notwithstanding plaintiffs' objection to its description of the underlying incident because it complied with the limited legal requirement that the report "accurately describe[] the adverse action that was taken against the physician and the reporting hospital's explanation for the action, which is the hospital's statement of what the physician did wrong"); *Cerciello v. Sebelius*, 2016 WL 1257514, at *6 (E.D. Pa. Mar. 31, 2016) (reviewing § 11136 adjudication as final agency action under the APA).

<u>Military Records</u> - In a law passed on the heels of the APA, Congress provided that the "Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice . . . under procedures established by the Secretary concerned." 10 U.S.C. § 1552(a). Courts have long held that a refusal to correct this information is subject to judicial review under the APA, despite Congress's silence on the issue. *See Ashe v. McNamara*, 355 F.2d 277, 281-82 (1st Cir. 1965) (judicial review of § 1552 petition denial to change character of discharge "is in line with others which find no inconsistency between legislatively declared 'finality' of administrative action and judicial correction of administrative action found to be violative of constitutional right, otherwise illegal or without basis in fact"); *Barber v. Widnall*, 78 F.3d 1419, 1423 (9th Cir. 1996) (finding justiciable a challenge to agency's denial of § 1552 petition to amend military record to give plaintiff sole credit for shooting down mastermind behind Pearl Harbor attack).

* * *

Congress deliberately enlarged the Paperwork Reduction Act when it enacted the IQA in 2000, imposing explicit obligations on agencies to fulfill enumerated standards in lieu of merely encouraging, as the prior statutory scheme did, the development of policies and principles applicable to agency disseminations of data. *Compare* Pub. L. No. 104-13 (May 22, 1995) *codified at* 44 U.S.C. § 3504(d)(1). In the IQA, Congress (i) specified that those guidelines must maximize the "quality, objectivity, utility, and integrity" of agency disseminations of information; (ii) set up an informal adjudication process for an agency to determine compliance with those guidelines; and (iii) granted affected parties a specific right to "obtain correction" if agencies failed to do so. Congress enacted these standards and provided an avenue for administrative relief against the APA's provision for judicial review not only of "[a]gency action [that is] made reviewable by statute" but also of *"final agency action for which there is no other adequate remedy in a court*." 5 U.S.C. § 704 (emphasis added).

Congress was not blind to the risk of imposing unmanageable demands on the judiciary in the review of agency communications, and cabined the IQA to ensure that the review of IQA determinations would not overwhelm agencies or the courts. It retained § 3504(d)(1)'s limitation on the applicability of the IQA guidelines to "information disseminated by Federal agencies," which are terms with "longstanding definitions" in OMB's existing information quality documents. 67 Fed. Reg. 8452, 8453 (Feb. 22, 2002). In doing so, Congress excluded:

- Agency "opinions," rather than "facts or data." *See id.* at 8460.

- Information-sharing within an agency or between agencies, or to government employees, agency contractors, or agency grantees. *See id.*

- Agency archives and responses to requests for agency records under FOIA, the Privacy Act, Federal Advisory Committee Act, or "other similar law." *See id.*

- Agency correspondence with persons.  *See id.*

- Press releases.  *See id.*; *see also Harkonen v. U.S. Dep't of Justice*, 800 F.3d 1143, 1150 (9th Cir. 2015).

- Public filings by agencies.  *See* 67 Fed. Reg. at 8460.

- Agency subpoenas and adjudicative processes.  *See id.*; *Prime Time Intern. Co. v. Vilsack*, 599 F.3d 678, 685-86 (D.C. Cir. 2010).

Ultimately, while Congress may have given agencies considerable latitude in exercising their responsibilities under the IQA, it did not give them unremitting discretion.  OMB continued this practical balance in its IQA guidelines, which reconcile the agencies' need for common-sense flexibility in light of the "wide variety of data and information" they compile with Congress's core instruction that the IQA must be given real effect.  The law requires agencies to "make their methods transparent by providing documentation, ensure quality by reviewing the underlying methods used in developing the data and consulting (as appropriate) with experts and users, and keep users informed about corrections and revisions."  67 Fed. Reg. at 8453.  A court may review whether an agency's shortcomings in exercising its statutory duties require the agency's action to be set aside under the APA.

Nor will a court exercising its customary role of review require it to create its own redline of an agency's report or otherwise create an undue burden on the judiciary, as the Agencies insist.  The Agencies' argument wrongly "entangle[s] the concepts of jurisdiction to review with the scope of judicial review." *Neal v. Sec. of Navy & Commandant of Navy Corps.*, 639 F.2d 1029, 1037, 1043-44 (3d Cir. 1981) (agency "erred in fulfilling its statutory obligation to 'correct an injustice' when it failed to recognize that the procedures followed by the [agency] were so

inherently unfair as to taint the merits of its decision" denying Marine permission to reenlist based on undisclosed psychiatric reports on his sexual orientation). As the *Neal* Court explained,

> Congress has acted by providing servicemen with an administrative remedy for their wrongs. Once a plaintiff has sought relief from the Correction Board, such plaintiff is bound by that board's determination unless he can meet the difficult standard of proof that the Correction Board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced . . . .

639 F.2d at 1037 (quoting *Sanders v. United States*, 594 F.2d 804, 811 (Ct. Cl. 1979)).[3]

The same is true here. As Plaintiffs explained in their Opposition, the Court will not review IQA adjudications *de novo*. If the Court were to determine that the Agencies' denial of Plaintiffs' IQA petition violated the APA, it would remand to them to correct or otherwise remedy the legal violation. *See, e.g.*, *New Eng. Power Co. v. F.E.R.C.*, 533 F.3d 55, 61 (1st Cir. 2008) ("The proper course of action [after finding an APA violation] . . . is to remand so that the agency may 'bring to bear on the facts the proper administrative and statutory considerations, a function which belongs exclusively to the [agency] in the first instance.'" (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 200 (1947)). There is every reason to believe that the Agencies would act in good faith to comply with the Court's orders. And if the Agencies's disposition on remand still fell short under the IQA and APA, Plaintiffs' recourse would be to ask the Court to order the Agencies to try again. Plaintiff could not ask the Court to rewrite the Report itself, any more than a court could rewrite agency regulations that violate the APA. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1111 (D.C. Cir. 2014) (district court erred in ordering agency

---

[3] *Neal* also referenced that "money" needed to be "due" the serviceman. *Id.* But that reference is only because it was quoting a decision of the Court of Claims, a predecessor to the U.S. Court of Appeals for the Federal Circuit whose jurisdiction relied on the availability of money damages. Courts have allowed APA adjudication under § 1552(a) even when money is not due. *See, e.g.*, *Barber*, 78 F.3d at 1423.

how to calculate particular challenged payments "rather than just remanding after identifying the [agency's] error"). The deferential review set out by the APA preserves the Court's traditionally limited role, even here. *See, e.g.*, *San Luis & Delta Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) ("The determination of what constitutes the 'best scientific data available' belongs to the agency's special expertise. . . . Absent superior data, occasional imperfections do not violate the ESA best available standard.") (quotations omitted); *Barber*, 78 F.3d at 1423 ("emphasiz[ing] the limited role [a] court plays in reviewing the ruling of the Secretary" under § 1552(a), which is not to determine the actual truth of the allegedly incorrect record, "but only to review the Secretary's decision to ensure that it complied with the law, was rational, and was based on substantial evidence"); *Leal*, 620 F.3d at 1284 (under § 11136, court "does not act as a factfinder deciding whether incidents listed in the report actually occurred or as an appellate body deciding whether there was sufficient evidence for the reporting hospital to conclude that those actions did occur" but only reviews for compliance with regulations and statute).

There will no doubt be borderline cases. But this is not one of them. The Agencies have admitted to making a substantively false claim and have acknowledged that this Report is inconsistent with the IQA's requirements. Am. Compl. ¶¶ 94-95. It is not enough to promise to do better in the future. The Agencies' determination to do nothing to conform *this* Report to the IQA exceeds the discretion they are afforded under the OMB Guidelines. Under no conception of the IQA's requirements does this adjudication satisfy the APA's review standards. Plaintiffs respectfully request that the Court enforce the right that Congress granted Plaintiffs to "obtain correction" of the Report, and deny the Agencies' motion to dismiss.

Dated: December 11, 2019

| | |
|---|---|
| Benjamin L. Berwick<br>(D. Mass. Bar. No. 679207)<br>PROTECT DEMOCRACY PROJECT, INC.<br>15 Main St.<br>Suite 312<br>Watertown, Massachusetts 02472<br>Telephone:  (202) 579-4582<br>Facsimile:  (929) 777-8428<br>ben.berwick@protectdemocracy.org<br><br>Justin Florence<br>(D. Mass. Bar. No. 667129)<br>Jamila G. Benkato<br>*Pro Hac Vice*<br>PROTECT DEMOCRACY PROJECT, INC.<br>2020 Pennsylvania Avenue, NW, Ste 163<br>Washington, DC 20006<br>Telephone:  (202) 599-0466<br>Facsimile:  (929) 777-8428<br>justin.florence@protectdemocracy.org<br>jamila.benkato@protectdemocracy.org | /s/ Meaghan VerGow<br>Meaghan VerGow<br>O'MELVENY & MYERS LLP<br>*Pro Hac Vice*<br>1625 Eye Street, N.W.<br>Washington, DC 20006<br>Telephone: (202) 383-5300<br>Facsimile:  (202) 383-5414<br>mvergow@omm.com<br><br>Shane A. Hunt<br>O'MELVENY & MYERS LLP<br>*Pro Hac Vice*<br>Time Square Tower<br>7 Times Square<br>Telephone: (212) 326-2000<br>Facsimile: (212) 326-2061<br>shunt@omm.com |

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants by first-class mail, postage prepaid, on December 11, 2019.

*/s/ Meaghan VerGow*
Meaghan VerGow