UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PROTECT DEMOCRACY PROJECT, INC.; BRENNAN CENTER FOR JUSTICE AT NEW YORK UNIVERSITY SCHOOL OF LAW; MICHAEL F. CROWLEY; and BENJAMIN WITTES,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE; DEPARTMENT OF HOMELAND SECURITY; MERRICK GARLAND, in his official capacity as Attorney General of the United States; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>    Defendants. | Civil Action No.<br>18-10874-FDS |

## MEMORANDUM AND ORDER

**SAYLOR, C.J.**

This is a lawsuit that seeks to amend a federal government report on terrorism. In a March 2017 Executive Order, then-President Donald J. Trump instructed the Department of Justice and Department of Homeland Security to issue a report setting forth information about foreign nationals and terrorism. Plaintiffs contend that the report, which was issued in January 2018, was biased and inaccurate. They petitioned the agencies to withdraw or revise it, which the agencies declined to do.

Plaintiffs then brought this action against the Attorney General and the Secretary of

Homeland Security, purporting to assert claims under the Information Quality Act ("IQA") and the Administrative Procedure Act ("APA").[1]  They seek a judicial order compelling the agencies to revise the report or to withdraw it.  Defendants have moved to dismiss the action for failure to state a claim upon which relief can be granted.  The matter was transferred to the undersigned judge on June 28, 2023.

Plaintiffs' claims derive almost entirely from the editorial judgments made by the authors of the report.  Plaintiffs complain, among other things, that the report leaves the reader with various wrong impressions; that allegedly critical facts are omitted or not properly emphasized, that other information is presented without a proper context; and that certain illustrative examples are not truly illustrative.  (Am. Compl. ¶¶ 8-14).

Furthermore, the complaint takes issue not only with the report itself, but with the fact that the Trump administration used the report to support its "political and policy agenda"—specifically, the need for stricter immigration policies.  (*Id.* ¶ 15).

Plaintiffs are not mentioned in the report, and there is nothing in it that is alleged to have any particularized impact on their property, their incomes, or their reputations.  In that respect, therefore, they are no different from any of the other hundreds of millions of persons who are citizens of the United States.  Their standing to assert the claims therefore turns entirely on whether a federal statute provides them with a private right of action.

No such statute, however, exists.  Private citizens are simply not empowered to obtain a court order compelling a government agency to revise the content of a written report with which they disagree—and particularly not if the goal of the litigation is to oppose a political agenda

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the current Attorney General and Secretary of Homeland Security have been substituted as parties.

with which they disagree.[2]

In short, plaintiffs are without standing and do not have a private right of action to require amendment of the report. Accordingly, the lawsuit is entirely without merit and will be dismissed.

**I.     Background**

    **A.     Factual Background**

In January 2017, then-President Trump promulgated Executive Order 13769, *Protecting the Nation from Foreign Terrorist Entry into the United States* ("EO-1"). In March 2017, he promulgated a revised Executive Order ("EO-2") with the same name. EO-2 instructed the "Secretary of Homeland Security, in consultation with the Attorney General, to collect and make publicly available" certain information concerning the relationship between foreign nationals in the United States and terrorism; gender-based violence against women, including honor killings; and "any other information relevant to public safety and security as determined by the Secretary of Homeland Security or the Attorney General." EO-2 at 16-17.

In response, the agencies released a report in January 2018. The report provides data on the number of foreign nationals charged with or convicted of terrorism-related offenses. (Report at 2). It provides detailed descriptions of the circumstances and terrorist-related activity of eight individuals who were among the 402 foreign nationals or naturalized citizens convicted of terrorism-related charges in the United States between September 11, 2001, and December 31, 2016. (*Id.* at 3-7). It further states that the agencies do not have unclassified, aggregate statistical information on the number of foreign nationals who have been radicalized after entry into the United States. (*Id.* at 7). Some information about the frequency of gender-based

---

[2] Of course, this Court expresses no view as to the accuracy or bias of the report.

violence, forced marriages, and honor killings in the United States is provided in the report. (*Id.* at 7-8). In addition, statistics are provided concerning DHS encounters with known or suspected terrorists, removal of foreign nationals for aggravated or multiple felonies, egregious public safety-related offenses by foreign nationals, and foreign travelers whom DHS has prevented from boarding planes destined for the United States. (*Id.* at 8-10).

On February 8, 2018, plaintiffs Protect Democracy Project, Inc., Brennan Center for Justice at New York University School of Law, Michael F. Crowley, and Benjamin Wittes filed identical administrative petitions with the agencies seeking corrections to the report (the "petitions") on the basis that it did not meet the objectivity, utility, and integrity standards of the Information Quality Act. (*See generally* Ex. 2, Am. Compl.).[3] Plaintiffs sought "correction" of the report in nine areas.

First, plaintiffs claim that "by focusing exclusively on the contribution of foreign-born individuals to the problem of terrorism while omitting significant categories of domestic actors, the Report leaves the reader with the [inaccurate] impression that foreign-born individuals are the primary perpetrators of acts of terrorism more generally." (*Id.* at 7).

Second, plaintiffs claim that it is deceptive for the report to mention only once, and "in passing," that the report's data on individuals convicted of international terrorism-related charges in the United States includes "defendants who were transported to the United States for prosecution." (*Id.*).

Third, plaintiffs claim that the data the report cites on terrorism-related convictions

---

[3] According to the complaint, Protect Democracy, Inc. is a not-for-profit organization "whose mission is to engage in research, public education, and litigation as necessary to prevent our democracy from declining into a more authoritarian form of government" (Am. Compl. ¶ 25); the Brennan Center for Justice at New York University School of Law is a not-for-profit institute "that seeks to improve the nation's systems of democracy and justice" (*Id.* ¶ 26); Michael F. Crowley is a former senior policy analyst at the Office of Management and Budget (*Id.* ¶ 19); and Benjamin Wittes is the editor-in-chief of *Lawfare*, an online publication "dedicated to integrity in national security decision making." (*Id.* ¶ 28).

4

should be, but are not, accompanied by a preamble that puts the data in context. (*Id.* at 8).

Fourth, plaintiffs take issue with the agencies' distinctions between naturalized American citizens and citizens by birth. (*Id.*).

Fifth, plaintiffs question whether the eight "illustrative examples" of foreign-born individuals convicted of international terrorism-related charges are truly illustrative. (*Id.*).

Sixth, plaintiffs claim that the data concerning DHS encounters with individuals on the terrorist watchlist traveling to the United States are not properly contextualized. (*Id.* at 9).

Seventh, plaintiffs state that the report inaccurately says that "aliens were convicted for 69,929 sex offenses" between 2003-2009, when in reality that number refers to arrests, not convictions, and the relevant time period was 1955-2010. (*Id.*).

Eighth, plaintiffs dispute the agencies' statistics on honor killings and forced marriages, arguing that they are not based on statistically reliable sources. (*Id.* at 9-10).

Finally, plaintiffs claim that the report "suffers from a general lack of transparency about the underlying data on which it relies." (*Id.* at 10).

The Department of Justice denied the petition in a letter dated July 31, 2018, concluding that "the Department has determined that there is no inconsistency with the IQA guidelines." (Ex. 5 at 3, Am. Compl.). The Department of Homeland Security likewise denied the petition in a several-page letter dated August 1, 2018, concluding that "neither retraction nor correction of information in the Initial Section 11 Report is warranted." (Ex. 6 at 2, Am. Compl.).

Plaintiffs filed administrative appeals with each agency on September 13, 2018, which the agencies denied respectively in December 2018 (DOJ) and February 2019 (DHS). (*See generally* Ex. 7, Am. Compl.). In their letters denying the appeals, the agencies stated that the report met the requirements under the IQA, even though the agencies did make an "editorial

error" concerning the data from a GAO report. (Ex. 9 at 3, Am. Compl.). The agencies also acknowledged that the report could be perceived as biased, but found that the possibility of this perception did not constitute a violation of the IQA. (*Id.*).

### B. Procedural History

Plaintiffs filed the complaint with this court in May 2018—before the agency denied the appeals—seeking to compel the agencies to respond to its petitions. The agencies moved to dismiss the complaint in August 2018 and thereafter rejected the appeals. This court (Woodlock, J.) initially stayed the proceedings in this court pending resolution of the administrative appeals to the agencies, and then denied the agencies' motion to dismiss, without prejudice, subject to the filing of new motions to dismiss at the conclusion of the administrative appeals.

In March 2019, after the administrative appeals had concluded, the court lifted the stay. Plaintiffs then filed an amended complaint seeking a declaration that the agencies' failure to grant the petitions and appeals violated the IQA and APA, and requesting injunction ordering the agencies to withdraw or correct the report. Defendants then moved to dismiss the complaint for failure to state a claim upon which relief can be granted.

## II. Standard of Review

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a

complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

### III.     Analysis

Defendants have moved to dismiss on the grounds that plaintiffs lack standing and that there is no private right of action permitting the court to order the requested relief. The court will first address the issue of the existence of a right of action, and then address standing.

#### A.     The Information Quality Act

The Information Quality Act does not, by its terms, provide a private right of action. Plaintiffs nonetheless contend that the IQA grants "affected persons" a statutory right to "seek *and obtain* correction of information . . . disseminated by the agency that does not comply with its standards." (Pls.' Mem. at 9-10). That, however, is a substantial mischaracterization of the law.

The IQA was enacted as part of the Paperwork Reduction Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763. It directs the Office of Management and Budget to issue guidance to federal agencies "for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies" in fulfilment of the purposes of the Paperwork Reduction Act. 44 U.S.C. § 3516. It further instructs that those guidelines "shall . . . establish administrative mechanisms allowing affected persons to seek and

obtain correction of information maintained and disseminated by the agency that does not comply" with the guidelines.  *Id.*  The IQA does not confer any direct statutory rights to affected parties to engage judicial review; it requires only that the OMB issue guidelines in accordance with its instructions.

In response to the statutory instruction, the OMB issued guidelines in 2002.  67 Fed. Reg. 369-01 (Jan. 3, 2002).  The guidelines provide that

> agencies shall adopt a basic standard of quality (including objectivity, utility, and integrity) as a performance goal and should take appropriate steps to incorporate information quality criteria into agency information dissemination practices. Quality is to be ensured and established at levels appropriate to the nature and timeliness of the information to be disseminated.  Agencies shall adopt specific standards of quality that are appropriate for the various categories of information they disseminate.

*Id.*  In addition, the OMB guidelines instruct agencies to

> establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines.

*Id.*

The DOJ then issued guidance concerning information quality.  DEP'T OF JUST., INFORMATION QUALITY, https://www.justice.gov/information-quality.  The DOJ guidance document asserts that the guidance

> is not regulation, is not legally enforceable, and does not create any legal rights or impose any legally binding requirements or obligations on DOJ or the public. Nothing in this guidance affects any otherwise available judicial review of this agency's actions.

*Id.*  The DOJ guidance explains DOJ's policies on information quality.  Among other things, it states that influential statistical information, meaning information that is "expected to have a genuinely clear and substantial impact at the national level, or on major public and private policy decisions as they relate to federal justice issues," should be given additional scrutiny.  *Id.*  The

DOJ guidance also provides a mechanism for the public to request corrections to information the DOJ has disseminated.  A member of the public may submit a Request for Correction to the DOJ.  The DOJ then needs to "[d]etermine whether a correction is warranted and, if so, what corrective action to take."  *Id.*  Accordingly, the "DOJ is not required to change or alter the content or status of information simply based on the receipt of a RFC."  *Id.*  If the DOJ denies the petition, the requester may file a Request for Reconsideration, and the "DOJ will base its decision on the merits of the information provided by the requestor."  *Id.*  There is no provision for judicial review.

The DHS also issued guidelines concerning information quality effective in 2011.  DEP'T OF HOMELAND SECURITY, INFORMATION QUALITY GUIDELINES, https://www.dhs.gov/sites/default/files/publications/dhs-iq-guidelines-fy2011.pdf.  Those guidelines are substantively similar to the DOJ guidance, and provide that the guidelines are not legally enforceable and that the administrative mechanism allows affected persons to "seek, and obtain, where appropriate, timely correction of information that does not comply with OMB guidelines, DHS guidelines, or component standards."  *Id.* at 6.  DHS's guidance, like that of the DOJ, provides for a Request for Correction and appeals process.

In short, the IQA does not confer any substantive rights on any person.  Instead, it instructs the OMB to issue guidelines, which it did.  The OMB guidelines do not confer any rights on any private citizen to correct information.  Instead, they instruct the agencies to establish a mechanism by which an affected person could seek and obtain correction *where appropriate.*  The agencies established such guidance, allowing affected persons to submit requests for correction and requiring the agencies to determine if a corrective action is appropriate.  The OMB's guidelines allow the agencies to establish guidance in which they retain

9

discretion to determine what corrections are appropriate. The agencies in turn established guidance in which they afforded themselves that discretion.

In short, the IQA neither confer rights on private parties nor provides a right of action to private parties to enforce its requirements. *See Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006) (finding that the IQA "does not create any legal right to access to information or its correctness"). *See also Harkonen v. United States Dep't of Justice*, 2012 WL 6019571, at *11 (N.D. Cal. Dec. 3, 2012), *aff'd*, 800 F.3d 1143 (9th Cir. 2015) ("Courts that have reviewed the IQA have uniformly found that it 'does not create any legal right to information or its correctness.'") (collecting cases); *Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083, 1097 (E.D. Cal. 2010) (finding that the IQA does not create any legal rights); *Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307, 316 (D.D.C. 2009) ("Because the IQA lacks any rights-creating language, [plaintiff] has no right under that statute to seek review of the USDA's actions."), *reversed in part on other grounds*, *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010).

### B.     The Administrative Procedure Act

Plaintiffs contend, in the alternative, that the IQA is subject to judicial review through the APA. The APA provides that courts have judicial review over final agency actions except where a statute precludes judicial review or agency action is committed to agency discretion by law. 5 U.S.C. § 701(a); § 704.

Even assuming that a "final agency action" within the meaning of the APA has occurred—which is doubtful, to say the least—this is clearly an instance where the relevant action is committed to the discretion of the agency.

A party is not entitled to judicial review where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This is the case "where statutes are drawn in such

broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) (quoting S. Rep. No. 752, 79th Cong, 1st Sess., 26 (1945)).

Here, the IQA instructed the OMB to establish administrative mechanisms, but did not prescribe any substantive standards itself. *See Family Farm All.*, 749 F.Supp.2d at 1092 ("[T]he IQA itself contains absolutely no substantive standards, let alone any standards relevant to the claims brought in this case."). The OMB created an administrative mechanism that requires the agencies to allow affected persons to seek and obtain, "*where appropriate*, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines." *See* 67 Fed. Reg. 391-01 (emphasis added).

The OMB provides no standard by which a court could determine whether an agency's denial of an affected person's obtaining correction is appropriate. Certainly, there are no standards for determining whether a report emphasizes the most relevant data, or whether a single mention of an allegedly important nuance is sufficient. Nor does an agency need to provide timely correction when the information the agency has disseminated does not comply with OMB or agency guidelines. Instead, the agency only needs to provide this correction when the information does not comply *and* "where appropriate." Under the circumstances, the Court cannot find that if information does not comply with agency guidelines, that agency must issue a correction when petitioned.

In its subsequently issued guidance, the DOJ, in accordance with its instructions from the OMB, gave itself complete discretion to "[d]etermine whether a correction is warranted, and, if so, what corrective action to take . . . . DOJ is not required to change or alter the content or status of information simply based on the receipt of a RFC." DOJ, INFORMATION QUALITY. The DHS guidelines state that DHS Components "need undertake only the degree of correction that

they conclude is appropriate for the nature and timeliness of the information involved." DHS, INFORMATION QUALITY GUIDELINES 6.

Accordingly, the agency action at issue is clearly committed to agency discretion by law. *See Hyatt v. Office of Mgmt. & Budget*, 908 F.3d 1165, 1174 (9th Cir. 2018) (holding that the determination of what remedy to take was "committed to the agency's discretion" where there was no "express standard" in the statute to "guide the OMB in determining whether any particular remedy is either 'appropriate' or 'necessary.'"); *see also Harkonen*, 2012 WL 6019571, at *16 ("The OMB Guidelines provide that agencies 'are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved,' which is akin to saying that the decision is committed to the agency's discretion."); *Family Farm All.*, 749 F. Supp. 2d at 1095 ("The IQA itself contains no standards concerning peer review, committing such matters to agency discretion.").

In short, plaintiffs do not have a private right of action under the IQA through the APA.

C.      **Standing**

In order to have standing, the complaint must allege that plaintiffs suffered a legally cognizable injury. "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). The injury "required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

Plaintiffs have not suffered any cognizable invasion of a legally protected interest. There is nothing whatsoever particularized about their claimed "injury"; if they suffered any injury, an

identical injury was suffered by hundreds of millions of American citizens.

Plaintiffs nonetheless argue that they have informational standing because "the IQA imposes an explicit disclosure requirement on the Agencies in response to petitions for correction." (Pls.' Mem. at 18). Again, however, the IQA does not impose such a disclosure requirement.

Plaintiffs also argue that they have procedural standing because the agencies "violated their statutory right to 'seek and obtain' a correction" to the report. Again, they do not have such a statutory right. *See Salt Inst.*, 440 F.3d at 159 (finding no standing because Congress had not "granted a legal right to the information in question" under the IQA); *Family Farm All.*, 749 F. Supp. 2d at 1103 (same).

Plaintiffs further contend that the Brennan Center and Protect Democracy have standing because they have committed resources to investigating the report and "publicly correct[ing] its falsehoods and misstatements," and that this should independently support standing. (Am. Compl. ¶ 72). Certainly, those organizations have published many blog posts and news articles about the report. (*See* Am. Compl. ¶ 72 nn. 27-30). However, it appears that the report is "simply a setback to the organization[s'] abstract social interests"—namely, "prevent[ing] the spread of disinformation" and "ensuring that the democratic process does not suffer due to the spread of disinformation." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The organizations cannot achieve standing "based merely on the expenses that [they] would have had to incur to engage in additional issue advocacy." *Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021).

Accordingly, plaintiffs are without standing to assert the claims in this matter.

## IV. <u>Conclusion</u>

For the foregoing reasons, defendants' motion to dismiss is GRANTED.

**So Ordered.**

Dated: July 11, 2023

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court